(Eddie) Jae K. Kim (SBN: 236805)
ekim@lcllp.com
**LYNCH CARPENTER, LLP**
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Telephone: (213) 723-0707
Facsimile: (858) 313-1850

*Attorneys for Plaintiff*
[Additional counsel on signature page]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARLENE OZBURN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FARMERS GROUP, INC.; FARMERS INSURANCE EXCHANGE,<br><br>Defendants. | Case No. 2:25-cv-08728<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Negligence;<br>2. Breach of Implied Contract;<br>3. Unjust Enrichment;<br>4. Declaratory Judgment.<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Arlene Ozburn ("Plaintiff") brings this Class Action Complaint on behalf of herself, and all others similarly situated, against Defendants Farmers Group, Inc. ("FGI") and Farmers Insurance Exchange (together "Farmers" or "Defendants"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE CASE

1. Plaintiff brings this class action lawsuit on behalf of all persons whose sensitive Personally Identifiable Information ("PII")[1] was impacted in a data breach that Defendants recently disclosed to Plaintiff and Class Members on or about August 22, 2025.

2. Defendants disclosed that a third-party vendor alerted Farmers on May 30, 2025 to suspicious activity involving an unauthorized actor accessing one of the vendor's databases containing Farmers customer information on or about May 29, 2025. (the "Data Breach" or the "Breach").[2]

3. After conducting an investigation that was completed on July 24, 2025, Defendants determined that certain personal information related to a select population of Farmers customers was subject to unauthorized access and acquisition.[3]

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79.

[2] *Notice of Security Incident*, Farmers Insurance, https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-of-incident.pdf (the "Notice") (last visited September 15, 2025).

[3] *Id*.

4. The data exposed in the Breach contained the PII of Plaintiff and Class Members, including names, addresses, dates of birth, driver's license numbers, and/or last four digits of Social Security numbers.[4]

5. Plaintiff's claims arise from Defendants' failure to properly secure and safeguard PII that was entrusted to them.

6. Plaintiff and Class Members are individuals who were required to indirectly and/or directly provide Defendants with their PII to obtain insurance.

7. In doing so, Plaintiff and members of the Class relied on Defendants to ensure the safety of the PII they collected.

8. Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on their affirmative representations to Plaintiff and Class Members, to keep their PII confidential, safe, secure, and protected from unauthorized disclosure or access.

9. Despite these duties and obligations Defendants failed to protect the PII of Plaintiff and members of the Class.

10. Defendants posted a "Notice of Data Security Incident" on their website.[5]

11. According to recent reports, the Breach may have impacted at least 1,111,386 policyholders of Defendants.[6]

12. Defendants claimed they began informing Policyholders of the Breach on August 22, 2025.[7]

---

[4] *Id.*
[5] *Id.*
[6] Lawrence Abrams, *Farmers Insurance data breach impacts 1.1M people after Salesforce attack*, BleepingComputer (Aug. 25, 2025), https://www.bleepingcomputer.com/news/security/farmers-insurance-data-breach-impacts-11m-people-after-salesforce-attack/.
[7] *See* Notice.

13. Notably, Defendants have not disclosed the nature of the attack, nor why the Breach went unannounced for months.[8]

14. The Breach occurred in part because of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' PII with which it was entrusted.

15. Despite the fact that Defendants concluded their investigation on July 24, 2025, they waited almost a full month, August 22, 2025, to begin notifying those impacted by the Breach.

16. As a direct and proximate result of Defendants' failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII is now exposed to cybercriminals.

17. Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and timely notice of the Data Breach.

18. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

---

[8] *Id.*

19. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their PII; and (f) the continued risk to their sensitive PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect it collected and maintained.

20. Plaintiff, on behalf of herself and all others similarly situated, alleges claims for negligence, breach of implied contract, unjust enrichment, and declaratory judgment arising from the Data Breach. Plaintiff seeks damages and injunctive relief, including the adoption reasonably sufficient practices to safeguard the PII in Defendants' custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendants to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

21. More specifically, Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendants, and declaratory relief

## **PARTIES**

22. Plaintiff is an adult, who at all relevant times, was a resident and citizen of the State of Arizona. Plaintiff has been a policyholder of Defendants and recently received a data breach notice informing her that her PII was compromised during the Data Breach.

23. Plaintiff has suffered actual injury from having her PII exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and needing to monitor her financial statements to ensure her information is not used for identity theft and fraud; (b) damages to and diminution of the value of her PII, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous imminent and impending injury raising from increased risk of financial identity theft and fraud.

24. As a result of the Data Breach, Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

25. Defendant FGI is corporation with its principal place of business in Los Angeles, California. FGI serves as the "attorney-in-fact" for Defendant Farmers Insurance Exchange. Upon information and belief FGI manages Farmers Insurance Exchange and provides its administrative services.

26. Defendant Farmers Insurance Exchange is a reciprocal insurance exchange with its principal place of business in California.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendants.

28. This Court has personal jurisdiction over Defendants because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendants reside in this District.

29. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendants reside in this District.

## FACTUAL BACKGROUND

30. Farmers is a multi-channel (exclusive agents, independent agents, and direct) and multi-product insurance provider, operating in 50 states.

31. Farmers offers a variety of personal automobile, personal property, business insurance, and personal lines specialty products.

32. Upon information and belief, Plaintiff and Class Members are policyholders who obtained insurance through Farmers.

33. Plaintiff and Class Members directly or indirectly, entrusted Defendants with their sensitive PII.

34. Plaintiff and Class Members value the confidentiality of their PII and, according, have taken reasonable steps to maintain the confidentiality of their PII.

35. In turning over their PII, Plaintiff and Class Members reasonably believed Defendants would safeguard their highly sensitive information.

36. By obtaining, collecting, and storing Plaintiff's and Class Members' PII, Defendants assumed equitable and legal duties to: (a) safeguard Plaintiff's and Class Members' highly sensitive information; (b) only use this information for business purposes; and (c) only make authorized disclosures.

37. Despite these duties, Defendants failed to employ reasonable data security measures to protect Plaintiff's and Class Members' PII and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiff's and Class Members' PII.

38. As a result of the Data Breach, Plaintiff has experienced, or is at an increased risk of experiencing, higher amounts of spam email, texts and phones calls.

**THE VALUE OF PI AND THE EFFECTS OF UNAUTHORIZED DISCLOSURE**

39. Defendants understood that the PII they were entrusted with was highly sensitive and of significant value to those who would use it for wrongful purposes.

40. Defendants also knew that a breach of their computer systems, and exposure of the PII stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

41. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

42. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9]

43. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[10]

44. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2023 alone, there were 6,077 recorded breaches – representing a 34.5% increase compared to 2022.[11] This trend is mirrored in identity theft complaints, which nearly doubled

---

[9] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[10] *What To Know About Identity Theft*, FTC Consumer Advice (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

[11] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

over a four-year span – from 2.9 million reports in 2017 to 5.7 million in 2021.[12] Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[13]

45. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, 2024 had the second-highest number of data compromises in the U.S. in a single year since such instances began being tracked in 2005.[14]

46. The ramifications of Defendants' failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for

[12] *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited September 15, 2025).

[13] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

[14] *Facts & Statistics: Identity Theft and Cybercrime*, n. 12.

years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[15]

47. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived in to providing the criminal with additional information.

48. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

49. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

---

[15] *Report to Congressional Requesters, Personal Information, June 2007*, U.S. Gov't Accountability Office, https://www.gao.gov/new.items/d07737.pdf (last visited September 12, 2025).

50. Indeed, the Social Security Administration warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a complete remedy for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[16]

51. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

---

[16] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

52. As set forth herein, despite this threat, and other known threats, upon information and belief, Defendants failed to take any action to increase security of the PII they held and knew to be highly valuable to cybercriminals.

53. Based on the value to cybercriminals of the PII in their possession, Defendants knew or should have known the importance of safeguarding the PII entrusted to them and of the foreseeable consequences if their data security systems were breached. Defendants failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**DEFENDANTS BREACHED ITS DUTY TO PROTECT PLAINTIFF'S AND CLASS MEMBERS' PII**

54. Defendants have asserted that they became aware of the Breach on May 30, 2025.[17]

55. Defendants asserted that as of July 24, 2025 they completed their investigation, and determined which files were impacted.

56. According to recent news reports, during the Data Breach, a threat actor gained access to their systems without authorization and obtained certain PII of close to 1.1 million customers of Defendants.[18]

57. The PII impacted by the Data Breach includes a wide swath of highly sensitive information belonging to customer of Defendants including their customers' names, addresses, dates of birth, driver's license numbers, and/or last four digits of their Social Security numbers.[19]

---

[17] *See* Notice.

[18] *See, e.g.*, Arite Beaty, 1.1M insurance customers were exposed in a data breach - here's what to know, ZDNet (Aug. 26, 2025), https://www.zdnet.com/article/1-1m-insurance-customers-were-exposed-in-a-data-breach-heres-what-to-know/.

[19] *Id.*

58. Defendants did not publicly post about the Breach until August 22, 2025.

59. According to security experts, the data accessed during the Breach "can be used to commit things like identity fraud,"[20]

60. Notably, this was almost three months after becoming aware of the Breach, and almost one month after the date they claim to have identified the impacted data.

61. Upon information and belief, Plaintiff and Class Members only received notice informing them that their PII was compromised during the Data Breach on or after August 22, 2025.

62. The Data Breach occurred as a direct result of Defendants' failure to implement and follow basic security procedures to protect the PII that it had collected and stored.

**DEFENDANTS FAILED TO COMPLY WITH FTC GUIDELINES**

63. Defendants are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

64. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.

[20] Giulia Carbonaro, *Farmers Insurance Data Breach Impacts 1 Million Americans: What To Know*, Newsweek (updated Sept. 2, 2025), https://www.newsweek.com/farmers-insurance-data-breach-impacts-1-million-americans-what-know-2120605.

According to the FTC, the need for data security should be factored into all business decision-making.[21]

65. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [22]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

[21] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[22] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited September 12, 2025).

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

66. The FTC further recommends that companies: (a) not maintain PII longer than is needed for authorization of a transaction; (b) limit access to private data; require complex passwords to be used on networks; (c) use industry-tested methods for security; (d) monitor for suspicious activity on the network; and (e) verify that third-party service providers have implemented reasonable security measures.[23]

67. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access

[23] *Id.*

to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68. Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to PI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

69. At all times, Defendants were fully aware of their obligations to protect the PII of its customers. Defendants were also aware of the significant repercussions that would result from a failure to properly secure the PII it maintained.

**DEFENDANTS' FAILURE TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH**

70. Defendants admit that an unauthorized third party accessed their information technology system.

71. Defendants failed to take necessary precautions or employ adequate measures necessary to protect their computer systems against unauthorized access and keep Plaintiff and Class Members' PII secure.

72. The PII that Defendants allowed to be exposed in the Data Breach is the type of PII that Defendants knew or should have known would be the target of cyberattacks.

73. Despite their own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[24] Defendants

[24] Protecting Personal Information: A Guide for Business, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' PII.

74. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[25] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

75. Here, Defendants inexcusably waited almost three months after the Data Breach occurred to notify impacted individuals.

**PLAINTIFF AND CLASS MEMBERS SUFFERED DAMAGES**

76. The ramifications of Defendants' failure to keep PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

77. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach.

78. As a result of the Data Breach, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII. According to one study, 28% of individuals affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that

[25] *Id.*

found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[26]

79. Further, Plaintiff and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

80. Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[27]

81. Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as Defendants fail to take necessary and appropriate security and training measures to protect the PII in their possession.

82. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their PII to strangers.

83. As a result of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable PII; the imminent and certainly impeding injury flowing from fraud and

[26] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited September 15, 2025).

[27] Kathryn Parkman, *How to Report identity Theft*, Consumer Affairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

identity theft posed by their PII being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their PII; and continued risk to Plaintiff's and the Class Members' PII, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the PII entrusted to them.

## CLASS ALLEGATIONS

84. Plaintiff brings this class action on behalf of herself and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

85. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose PII was compromised in the Data Breach (the "Class").

86. Excluded from the Class are Defendants, their subsidiaries and affiliates, officers and directors, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

87. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

88. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendants' records, including but not limited to

the files implicated in the Data Breach, but based on public information, the Class includes over one million individuals.

89. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendants had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendants were negligent in collecting and storing Plaintiff's and Class Members' PII, and breached their duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct.

90. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all customers of Defendants and each had their PII exposed and/or accessed by an unauthorized third party.

91. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

92. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient

adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

93. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendants breached their duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

94. **Injunctive Relief:** Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

95. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

## CLAIMS FOR RELIEF

## COUNT I

## Negligence

**(On Behalf of Plaintiff and the Class)**

96. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

97. Plaintiff and Class Members provided their non-public PII to Defendants as a condition of obtaining insurance.

98. Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII they collected from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendants' security systems to ensure that PII in Defendants possession was adequately secured and protected.

99. Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if their PII were wrongfully disclosed.

100. Defendants owed a duty of care to Plaintiff and Class Members to provide reasonable security, consistent with industry standards, to ensure that their systems and networks adequately protected their PII.

101. Defendants had a special relationship with Plaintiff and Class Members. Their willingness to entrust Defendants with their PII was predicated on the understanding that Defendants would take adequate security precautions to protect that PII.

102. By assuming the responsibility to collect and store this data, Defendants had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

103. Defendants' conduct also created a foreseeable risk of harm to Plaintiff and Class Members by failing to: (a) secure their systems and exercise adequate oversight of their data security protocols; (b) ensure compliance with industry standard data security practices, (c) implement adequate system and event monitoring, and (d) implement the systems, policies, and procedures necessary to prevent the Data Breach.

104. Defendants knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of their systems, and the importance of adequate security. Defendants should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

105. Defendants breached their common law duty to act with reasonable care in collecting and storing the PII of their customers, which exists independently from any contractual obligations between the parties. Specifically, Defendants breached their common law, statutory, and other duties to Plaintiff and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiff's and Class Members' PII;

c. storing PII longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

106. Defendants' failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' PII created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiff and Class Members did not contribute to the Data Breach or the subsequent misuse of their PII.

107. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements

discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

108. Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

109. Defendants had, and continue to have, duties to adequately disclose that the PII of Plaintiff and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

110. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

111. Defendants have acknowledged that the PII of Plaintiff and Class Members was disclosed to unauthorized third persons as a result of the Data Breach.

112. Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

113. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of a data breach involving the PII they obtained.

114. Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

115. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

116. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se.*

117. But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

118. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have and will suffer damages including, but not limited to: (a) the loss of value of their PII and loss of opportunity to determine for themselves how their PII is used; (b) the publication and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (d) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (e) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (f) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (g) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it; and (h) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

119. But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

120. There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

121. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) invasion of privacy; (b) lost or diminished value of PII; (c) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (d) loss of benefit of the bargain; (e) an increase in spam calls, texts, and/or emails; and (f) the continued and certainly increased risk to their PII, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

122. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

123. Additionally, as a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long

as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

124. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II**

**Breach of Implied Contract**

**(On Behalf of Plaintiff and the Class)**

125. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

126. In connection with obtaining insurance through Farmers, Plaintiff and Class Members entrusted Defendants with their PII.

127. In the course of obtaining insurance through Defendants, Plaintiff and Class Members had an implied contract with Defendants that they would protect the information they collected.

128. Plaintiff and Class Members were of the belief that this information would be safely guarded.

129. Defendants accepted possession of Plaintiff's and Class Members' PII for the purpose of providing insurance.

130. Pursuant to these implied contracts, in exchange for the consideration and PII provided by Plaintiff and Class Members, Defendants agreed to, among other things, and Plaintiff and Class Members understood that Defendants would: (1) implement reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII; and (2) protect Plaintiff's and Class Members' PII in compliance with federal and state laws and regulations and industry standards.

131. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

132. Implicit in the agreement of accepting Plaintiff's and Class Members' PII was Defendants' obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

133. The protection of PII was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendants, on the other hand. Indeed, as set forth herein, Defendants recognized its duty to provide adequate data security and ensure the privacy Plaintiff's and Class Members' PII with its practice of providing a privacy policy on their website.

134. When Plaintiff and Class Members provided their PII, they relied on the implied contract that their information would be protected.

135. Defendants breached their obligations under its implied contract in failing to implement and maintain reasonable security measures to protect and secure the PII, and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII in a manner that complies with applicable laws, regulations, and industry standards

136. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

137. On information and belief, at all relevant times, Defendants promulgated, adopted, and implemented written privacy policies whereby they expressly promised that they would only disclose PII under certain circumstances, none of which relate to the Data Breach.

138. On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

139. Plaintiff's and Class Members' PII would not have been entrusted to Defendants in the absence of the implied contract for Defendants to keep their information reasonably secure.

140. Plaintiff's and Class Members' PII would not have been entrusted to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

141. Importantly, California law provides that every contract includes good faith and fair dealing between the parties involved.

142. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

143. Defendants breached the implied contracts they made by failing to safeguard and protect the PII of Plaintiff and the Class Members, by failing to delete the PII once the relationship ended, and by failing to provide timely notice to Plaintiff and the Class Members that their PII was compromised as a result of the Data Breach.

144. Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of PII and storage of

other personal information after Defendants knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

145. Defendants' breach of their obligations of its implied contracts directly resulted in the Data Breach and the injuries that Plaintiff and Class Members have suffered from the Data Breach.

146. Plaintiff and Class Member suffered by virtue of Defendants' breach of their implied contracts because: (a) they paid for data security protection they did not receive; (b) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (c) their PII was improperly disclosed to unauthorized individuals; (d) the confidentiality of their PII has been breached; (e) they were deprived of the value of their PII, for which there is a well-established national and international market; (f) they have lost time and incurred expenses, and will incur future costs to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (g) they have overpaid for the services they received without adequate data security.

147. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

148. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate credit monitoring to all Class Members.

## COUNT III

## UNJUST ENRICHMENT

**(On Behalf of Plaintiff and the Class)**

149. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

150. This count is plead in the alternative to the breach of implied contract count above.

151. By their wrongful acts and omissions described herein, Defendants have obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

152. Plaintiff and Class Members conferred a benefit on Defendants, whereby their PII was provided to Defendants in the course of obtaining insurance.

153. Defendants caused Plaintiff and Class Members to reasonably believe that they would keep their PII secure.

154. The monies Defendants were paid in their ordinary course of business included a premium for Defendants' cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' PII.

155. Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from their relationship with Plaintiff and Class Members and used their PII for business purposes.

156. Defendants failed to disclose facts pertaining to their substandard information systems, or defects and vulnerabilities therein before Plaintiff and Class Members made their decision to provide Defendants with their PII.

157. Defendants enriched themselves by hoarding the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to their own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their PII.

158. Defendants failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members, and as a result, Defendants were overpaid.

159. Under principles of equity and good conscience, Defendants should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

160. Plaintiff and Class Members have no adequate remedy at law.

161. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) invasion of privacy; (b) lost or diminished value of PII; (c) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (d) loss of benefit of the bargain; (e) an increase in spam calls, texts, and/or emails; and (f) the continued and certainly increased risk to their PII, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

162. Plaintiff and Class Members are entitled to restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

**COUNT IV**

**DECLARATORY JUDGMENT**

**(On Behalf of Plaintiff and the Class)**

163. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

164. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

165. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and remains at imminent risk that further compromises of her PII will occur in the future.

166. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure PII and to timely notify impacted individuals of a data breach under the common law, FTCA, and various state statutes; and

b. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure PII in their possession.

167. This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect PII in Defendants' data network.

168. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and she will be forced to bring multiple lawsuits to rectify the same conduct.

169. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

170. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. For an Order certifying this action as a class action, appointing Plaintiff as class representatives for the Class, and appointing Plaintiff's counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to data collection, storage, and safety, and to disclose with specificity the types of PII compromised as a result of the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E. Ordering Defendants to pay for not less than ten years of credit monitoring services for Plaintiff and Class Members;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 15, 2025

Respectfully submitted,

**LYNCH CARPENTER, LLP**

*<u>/s/ (Eddie) Jae K. Kim</u>*
(Eddie) Jae K. Kim (SBN: 236805)
ekim@lcllp.com
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Telephone: (213) 723-0707
Facsimile: (858) 313-1850

Gerald D. Wells, III (SBN: 257496)
Robert J. Gray*
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
jerry@lcllp.com
rob@lcllp.com

***Attorneys for Plaintiff and the Proposed Class***
* *Pro hac vice* application forthcoming